# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

ROBERT H. JACKSON and
BETTYE L. JACKSON,

      Debtors.

Case No. 08-11179-SSM
(Chapter 13)

## MEMORANDUM OPINION

The issue before the court is the reasonable amount of attorney's fees incurred by a creditor in pre-petition litigation with the debtor.  Navy Federal Credit Union filed a proof of claim for $212,108.30 which included $149,000 for pre-petition attorney's fees and expenses.  The debtors objected, asserting that the amount of fees and expenses was unreasonable.

## The Second Deed of Trust Note

This case concerns one of the debtors' six loans with the credit union,[1] a note fully secured by a second deed of trust on the debtors' home.[2]  The loan was made on July 16, 2004 in the original principal amount of $60,000.00.  The first payment was due on September 1, 2004.  The monthly

---

[1] The debtors were indebted to the credit union on six obligations when they filed bankruptcy:  the first and second trusts secured by their home; two car loans and two unsecured signature loans.  The credit union filed a proof of claim for each loan.  The proof of claim for the note secured by the second deed of trust is discussed above.  The proof of claim for the first deed of trust note was for $144,270.68 which included a pre-petition arrearage of $15,673.39.  The monthly payment of principal and interest was $1,147.21.  The proof of claim for one car loan was for $25,186.36 which included a pre-petition arrearage of $1,866.99.  The proof of claim for the other car loan was for $9,213.63 which included a pre-petition arrearage of $2,168.75.  The proofs of claim for the two unsecured loans were for $5,283.60 and $2,741.22.

[2] The debtors scheduled their residence with a current value of $506,500.00 and total secured debt of $190,694.76.  The credit union was the only party secured by the residence.  Its first deed of trust was for $144,270.68; the second with the disputed attorneys fees was $212,108.30.

payment of principal and interest was $503.08.  The proof of claim was for a total of $212,108.30

of which the pre-petition arrearage was $160,213.64.[3] It stated that the principal balance outstanding

as of the date of the filing of the petition in bankruptcy was $53,261.94; that the "Prepetition

litigation expenses" were $149,000; and that the pre-petition foreclosure expenses were $7,830.00.

The credit union's second trust, including the $149,000 in attorneys fees,  is fully secured.


### The Pre-petition Litigation

Differences arose between the debtors and the credit union[4] as to whether the second deed

of trust note was in default.  At issue was whether all required payments had been made, and

whether payments intended for the second trust loan had been improperly applied to one of the

debtors' other five loans with the credit union.  They were unable to resolve the issues.  The credit

union was obviously frustrated by its inability to resolve the matter. Its basic position was that its

---

[3]The proof of claim contained the following Statement of Account:

#### STATEMENT OF ACCOUNT

| | | |
|---|---|---|
| Principal balance | $53,261.94 | |
| Accrued interest | $1,651.20 | |
| Accumulated late charges | $365.16 | |
| Negative escrow balance/advances | | $0.00 |
| Prepetition litigation expenses | $149,000.00 | |
| Prepetition foreclosure expenses | $7,830.00 | |
| TOTAL | $212,108.30 | |

#### Prepetition Arrearages

| | |
|---|---|
| Monthly payment ($503.08/mo. x 6) | $3,018.48 |
| Accumulated late charges | $365.16 |
| Prepetition litigation expenses | $149,000.00 |
| Prepetition foreclosure expenses | $7,830.00 |
| TOTAL | $160,213.64 |

[4]Thomas Connelly, the credit union's general counsel, testified that Navy Federal Credit Union is the largest credit union in the world.

records were correct and the debtors failed to produce any documentary evidence showing any error in its records.[5]   It asserted that the debtors produced no cancelled checks or other evidence of payments that were not accounted for by the credit union or were misapplied.

The debtors frequently paid by wire transfer.  Some of the wire transfers indicated which loan the payment was intended for.  Many had no instructions.  The credit union applied the payments as instructed if there were instructions; otherwise it tried to determine which loan the payment was intended for by comparing the payment to the various scheduled loan payments.  Many times, however, the payment amount did not correspond to the amount of any of the scheduled loan payments.  If the credit union could not identify which loan the payment was for, it deposited the payment into the debtors' savings account.  It then drafted the savings account when the next loan payment became due and made that loan payment.  Tr. at 66-68.  Despite the credit union's efforts to convince the debtors that its records were correct, the debtors were unconvinced and insisted that the credit union had made mistakes.  They did not identify the mistakes.[6]

The credit union calculated that the debtors were $667.44 in arrears on the second trust, a little more than one monthly payment, and other amounts on some of the other loans.  Without a resolution with the debtors, the credit union decided to foreclose the second trust.  It sent a default

---

[5]Thomas Connelly, general counsel for the credit union, testified:

> I thought it would be a relatively simple matter to reconcile the records, look at whatever Captain and Mrs. Jackson had in their records.  And then, as I got into it, it was not at all simple because our records were pretty clear that the Jacksons were in default, and the Jacksons kept insisting that we had made mistakes, made mistakes, made mistakes.  I couldn't find mistakes. . . .  We had, in my opinion, bent over backwards to work with them.  And I, frankly, couldn't understand it.  . . .  My approach was to say, "Show us where you paid the money, and we will fix it.  If we made a mistake, we'll fix it."  You know, that's how we do business.

Tr. at 39-40.

[6]The credit union maintained separate systems for recording loan payments for the different types of loans, real estate loans, car loans and signature loans.

letter and the trustee scheduled a foreclosure sale on the second deed of trust for March 27, 2007.

The debtors responded by filing a five-page, two-count complaint for declaratory judgment and injunctive relief in the Circuit Court for Fairfax County, Virginia, against the trustee requesting the court declare they were current in their first and second trust payments and enjoin the threatened foreclosure.[7]  Although the suit was filed on March 20, 2007, and the trustee and the credit union were aware of it, it was not served on the trustee under the deed of trust until September 6, 2007. The motion for a preliminary injunction was granted at a hearing held on September 10, 2007.[8]

The trustee filed an answer on September 26, 2007.  The same day, the case was set for trial to be held on February 27, 2008.  The credit union intervened and on October 2, 2007, filed a pleading which the court's docket described as "Motion Filed to Dismiss Count I for Lack of Subject Matter Jurisdiction; or, in the Alternative, Motion for [Bill of Particulars] and Motion Craving Oyer; or, in the Alternative, Answer to Complaint for Declaratory Judgment and Injunctive Relief". (Count I requested a declaratory judgment that neither the first nor the second deed of trusts were in default.)  John Hawthorne then substituted in as counsel for the debtors and on October 18, 2007, filed a motion seeking to amend the complaint to add a count requesting an accounting and a count

---

[7]The complaint set out the dispute from the debtors' point of view.  They alleged that the credit union sent a default letter on January 16, 2007 asserting a default in the amount of $667.44 for the months of December 2006 and January 2007.  They disputed this, stating that they were current.  "Believing that NFCU was in error when it sent its January 16, 2007 notice, but believing also, from prior experiences with NFCU that it would be difficult to convince NFCU that all payments had been made, [the debtors] made the requested payment."  Complaint, Ex. C at ¶8.  They then made an additional payment of $1,100.00 to be applied to any other "purported arrearage with NFCU."  Id. at ¶9.  Both payments were returned because they "were not sufficient to cure the purported default."  Id. at ¶10.  Count I then requested declaratory relief and Count II requested an injunction.  The parties attempted to resolve the matter after the suit was filed.

[8]The foreclosure sale was postponed while the parties sought to resolve the matter.  The trustee was authorized to recommence the foreclosure on March 1, 2008 and July 24, 2008.  Ex. B.  The debtors then pursued the suit.

alleging tortious conduct, and to increase the requested damages to $2.8 million.  Tr. at 50-51.[9]  The

credit union filed a memorandum in opposition to the motion to amend.  The debtors' motion to

amend was denied on November 17, 2007 as was the credit union's motion to dismiss.

Mr. Hawthorne filed a motion to withdraw as counsel on January 4, 2008 to which the credit

union filed a Brief in Response.  The motion was granted on January 25, 2008, and the debtors

proceeded unrepresented until the end of the case on February 29, 2008.

The credit union undertook discovery.  It does not appear that the debtors undertook any

discovery.  The debtors did not respond to the credit union's discovery and it filed a motion to

compel on January 11, 2008.  The credit union filed a second discovery motion on January 17, 2008

which it later withdrew.  The motion to compel was granted on January 25, 2008.  On February 8,

2008, the credit union filed a motion to dismiss and a motion for sanctions.  The motion to dismiss

was denied and the motion for sanctions was granted.  The debtors were prohibited from introducing

into evidence documentary evidence not supplied during discovery.  Mrs. Jackson was prohibited

from testifying because she refused to testify at her deposition.

The trial was held on February 29, 2008.  Capt. Jackson testified that he was current and

rested.  "And then, ultimately, at trial, the trial attorney of Hunton & Williams took Captain Jackson

on cross-examination through over 100 documents before he finally – Captain Jackson admitted that

he was in default."  Tr. at 51.  The credit union's motion to strike was granted.

In brief, the circuit court's docket shows that a temporary injunction was granted, the

debtors' motion to amend the complaint was denied, the credit union's discovery motions were

_____

[9]The only pleading introduced into evidence at the hearing in this court was the original Complaint for
Declaratory Judgment and Injunctive Relief.  The nature and content of other pleadings is gleaned from the Circuit
Court's docket, Ex. 1; Hunton & Williams' time records, Ex. F; and the oral testimony.

granted, and the credit union's motion to dismiss was denied.  The trial lasted less than a half of a

day.  The only witness examined was Captain Jackson.  The case was dismissed at the conclusion

of his testimony.

### Hunton & Williams' Fees

Hunton & Williams represented the credit union.  It billed more than 525.25 hours to the case

for total fees in excess of $251,486.25.  Nine lawyers and three paralegals participated in the case.

Five of the attorneys expended 7.5 or fewer hours on the case.  Three paralegals expended a total

of 4.75 hours.  The bulk of the work was handled by John J. Range, a partner billing at $650 an hour,

who devoted at least 162 hours to the case for a total of at least $105,707.50, and Christopher B.

Ashby, an associate who billed 276 hours to the case at $380 an hour for a total of $104,880.00.  In

addition to expenses of at least $3,981.86, the credit union, on the recommendation of Hunton &

Williams, retained the accounting firm Stosch, Dacey and George, P.C. to prepare a forensic

accounting of the debtors' six accounts.  The bill for their work was $24,310.91.[10]

Thomas Connelly testified as an expert witness for the credit union.  He is the general

counsel for the credit union and had been since the June, 2007.  He hired and supervised Hunton &

Williams.  When asked why he retained Hunton & Williams, he stated:

> We were in litigation in Virginia, and I wanted a Virginia-based law firm.  I thought,
> based on everything I had seen so far, that the potential was there for this to be

---

[10]The bills from Hunton & Williams were submitted as Exhibit F and were also attached as an exhibit to the credit union's response to the debtor's objection to the proof of claim.  The first bill was dated October 24, 2007 for the month of September 2007.  The second bill was dated December 17, 2007 for the month of November 2007.  The bill for the month of October, 2007, was not a part of Exhibit F or the attachment to the credit union's response to the objection to its proof of claim.  The first page of the credit union's Response to Debtors' Objection to Proof of Claim, Litigation Invoice (part 1) at 1 (Docket Entry 194-5) is a summary of the bills.  It shows total fees and costs of $282,075.17.  The summary does not include an October 2007 statement.

complex litigation and that we needed somebody to do it right.  .  .  .  Obviously, we looked at McGuireWoods because that's probably the only other big firm based in Virginia.  I did not believe – we retain a number of very competent smaller firms and, in some cases, individual counsel for other things in Northern Virginia and elsewhere around the country, but I didn't think they had the particular expertise to deal with this, if the case went all the way to trial.  .  .  . In my experience . . . this was not going to be a case where I would be comfortable with a small firm who had dealt with foreclosures because ultimately I didn't think it was going to be a foreclosure case.

I thought we were going to have to get into some fairly sophisticated financial analysis, and I wanted a big firm to do that.  And I thought we were going to be in pitched adversarial litigation, and I needed a big time litigation firm to do that.

Tr. at 44-45.

Mr. Connelly opined that Hunton & Williams' bill was reasonable.  He testified that there were complicating factors in the case.  First, the debtors' counsel withdrew and they proceeded without counsel.  Second, the debtors made payments by wire transfer, some of which had no instructions, and the credit union had to allocate the payments to six separate accounts.  Last, the debtors did not cooperate in discovery.

Chris Beatley, an attorney who has practiced in Alexandria, Virginia, since 1976 was qualified as an expert witness and testified on behalf of the debtors.  He opined that the legal fees were unreasonable.  He testified that the case could have been handled in no more than 40 billable hours and that there was no need for any forensic accounting.  He noted some particular time entries such as four and one-half hours spent on "research and draft summary of business records exception to hearsay rule" and over thirty hours preparing the answer to a five-page complaint that said little more than the debtors believed they were current and wanted the threatened foreclosure enjoined. He opined that a reasonable fee in the case was $8,000 to $10,000.  The only issue in the case, he testified, was reconciling the accounts, "figuring out what money came in, where it was applied, and

what money was due and was not paid." Tr. 16.  These sorts of cases, in his opinion, are not complicated.  Typically, he stated lender's records are sufficient to determine the status of the account.  They are records maintained in the ordinary course of the business of the lender.   If admitted, the burden of going forward to show that the business records are inaccurate, for all practical matters, is on the debtors.  They must produce evidence of a payment that was made and not credited or show how the payment was misapplied.

Mr. Beatley acknowledged that there were complicating factors in this case.  The debtors' counsel withdrew after the motion to amend the complaint was denied and they proceeded pro se.  While making more work, he testified that it is not an overly complicating factor.  He acknowledged that the debtors did not cooperate in discovery.  Mr. Beatley opined that the proper way to handle that is to file a motion to compel and, if that is not complied with, a motion for sanctions.  The sanctions could be a monetary sanction or a sanction limiting defenses, limiting the ability to present evidence, or even dismissing the case.

> But it's not rocket science.  I mean, most attorneys I know have discovery motions on their computer.  You change the caption, you fill in the facts in the file, you show up, and it's never more than a half hour matter in circuit court.

Tr. at 20.

The third complicating factor was that the debtors used wire transfers to pay their various accounts.  Some of the wire transfers did not correspond with the precise amount of payments and did not indicate which account they should be applied to.  While requiring additional work, this did not impress Mr. Beatley as a significantly complicating factor particularly since the burden of going forward, and in the circuit court suit, the ultimate burden of proof, was on the debtors.

### Discussion

A proof of claim is *prima facie* evidence of the validity and amount of the claim. Fed.R.Bankr.Proc. 3001(f). The burden rests on the objecting party, in this case, the debtors, to rebut the *prima facie* effect of the proof of claim. *In re Terry,* 262 B.R. 657, 662 (Bankr.E.D.Va. 2001); *In re Wilkinson,* 175 B.R. 627, 628 (Bankr.E.D.Va. 1994); *C-4 Media Cable South, L.P. v. Reds T.V. and Cable, Inc. (In re C-4 Media Cable South, L.P.),* 150 B.R. 374, 377 (Bankr.E.D.Va.1992). The debtors did so. The nature of the litigation was shown through the credit union's general counsel's testimony, the circuit court's docket and Hunton & Williams' billing statements. It was not complex litigation. The assertion made that the first and second trusts were current raise basic questions of payment and proper accounting of payments received. The legal bills presented totaled $251,486.25 (which does not include the missing October, 2007 bill). Mr. Beatley testified as an expert witness and opined that attorney's fees were not reasonable. The evidence is more than sufficient to rebut the *prima facie* evidence of the amount of the proof of claim.

Once the *prima facie* evidence of the amount of the proof of claim is rebutted, the burden of proof is on the claimant. "If an objector succeeds in overcoming the prima facie effect of the claim . . . , the ultimate burden remains on the claimant to prove the claim's validity by a preponderance of the evidence. . . . In sum, the overall effect of this burden-shifting process is to return the burden from the objector to the claimant." *In re Terry,* 262 B.R. at 662. Under Virginia law, the credit union, as the party claiming the legal fees, "has the burden of proving *prima facie* that the fees are reasonable and were necessary." *Chawla v. BurgerBuster, Inc.,* 255 Va. 616, 623, 499 S.E.2d 829, 833 (1998). The Virginia Supreme Court discussed factors relevant to the

10

determination of the reasonableness of attorney's fees in *West Square, L.L.C. v. Communication Technologies, Inc.,* 274 Va. 425, 649 S.E.2d 698 (2007).  It stated:

> [A] fact finder may consider, *inter alia,* the time and effort expended by the attorney, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained, whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate.

> *Chawla,* 255 Va. at 623, 499 S.E.2d at 833; *accord Ulloa [v. QSP, Inc.],* 271 Va. 72, 82, 624 S.E.2d 43, 49 (2006); *Mullins [v. Richlands Nat'l Bank],* 241 Va. 447, 449, 403 S.E.2d 334, 335 (1991).  Under a contractual provision like the one at issue, however, a prevailing party "is not entitled to recover fees for work performed on unsuccessful claims." *Ulloa,* 271 Va. at 82, 624 S.E.2d at 49 (citing *Chawla,* 255 Va. at 624, 499 S.E.2d at 833).   .   .   .

> As both parties note, this Court has identified several factors that a fact-finder "may consider" in determining the amount of reasonable attorneys' fees to be awarded to a prevailing party. *Chawla,* 255 Va. at 623, 499 S.E.2d at 833.  We have not, however, stated that a fact-finder must consider all these factors in every situation. *See Connors v. Connors,* 594 S.W.2d 672, 676 (Tenn.1980) (identifying factors to be used as "guides in fixing a reasonable attorney's fee").  *But see Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir.1978) ("[twelve] factors must be considered by district courts in [the Fourth Circuit] in arriving at a determination of reasonable attorneys' fees") (emphasis added).  And, we decline to do so today.  In the determination of reasonable attorneys' fees, particular factors may have added or lessened significance depending on the circumstances of each case.

*West Square, L.L.C. v. Communication Technologies, Inc.,* 274 Va. at 434, 649 S.E.2d at 702-703.

The credit union failed to sustain its burden of the reasonableness of the attorney's fees charged in this case.  *Seyfarth, Shaw v. Lake Fairfax Seven Ltd. Partnership,* 253 Va. 93, 96, 480 S.E.2d 471, 473 (1997).

Much of the work was excessive and unnecessary.  It started with the hearing on the motion for a preliminary inunction.  Mr. Beatley testified that a preliminary injunction is relatively easy to

11

obtain.[11]  Mr. Connelly agreed.  "As [Mr. Beatley] said, it's relatively easy to get an injunction

against a foreclosure."  Tr. at 39.  "[Hunton & Williams] told me up front that injunction was likely

to be granted, and it was."  Tr. at 46.  The unsuccessful defense of the motion for the preliminary

injunction took three lawyers – two of whom tried the motion on behalf of the credit union – 21.00

hours and $10,856.25.

The preparation of the answer followed the hearing on the motion for a preliminary

injunction.  Mr. Beatley opined that the time devoted to preparing the answer to the complaint was

excessive.  He thought that the credit union's lawyers spent "at least 30-plus hours" preparing the

answer.  Tr. at 16.  It is difficult to determine exactly how many hours were spent preparing the

answer because the time entries are block entries, that is, individual work items are consolidated into

a single entry.[12]  The court found at least 69.0 hours devoted by three attorneys to preparing the

answer.[13]  The complaint is five pages long, consisting of 20 paragraphs in two counts.  Count I

sought a declaratory judgment that the debtors were not in default and Count II sought an injunction.

---

[11]Mr. Beatley testified:

Q       But a preliminary injunction was granted; is that correct?
A       And the burden is much lower for a preliminary injunction.  Most of what you talk about at
        the preliminary injunction is just how big the bond going to be.
Q       And simply if there is a likelihood –
A       A likelihood, yes.
Q       Some basis.
A       Anybody can get a preliminary injunction if they have money for a bond, basically.

Tr. at 29.

[12]It appears that the time records of each attorney for a single day are consolidated into one single entry for the
day with the total time expended and the total dollar of the day's services provided.  No individual accounting of time
expended is made.  It is impossible, for example, to determine how much time was spent on actual drafting of the answer
as opposed to settlement matters or preparing a forbearance agreement when all occurred during the same day.

[13]Mr. Ashby spent essentially all day for eight consecutive work days preparing the answer and the affirmative
defenses contained in it.  He might also have spent the first one or two days of October on the same project but the
October time records were not introduced into evidence.  During these eight days, he billed 59.75 hours to the case.

The allegations are set forth directly and simply.  There is nothing complicated about them.  They recite the loan, the deed of trust, the asserted default, the scheduled foreclosure sale and the Jacksons' assertion that they were current.  A conference with the client should have been sufficient to determine whether the allegations should have been admitted or denied.  Additional time may have been appropriate to consider defenses that should be raised.  The answer was not introduced into evidence and the court is unable to determine if additional time should have been devoted to preparing the answer.  The complaint and the nature of the litigation that followed do not support additional significant time for preparation of the answer.

The credit union's response to Mr Hawthorne's motion to withdraw took too much time.  He entered his appearance on behalf of the debtors in the circuit court case and filed a motion to amend.  When the motion was denied, he moved to withdraw.  The motion to withdraw was filed on January 4, 2008.  On that date, three attorneys billed time relating to the motion for debtor's counsel to withdraw.   Time entries are as follows:

| Attorney | Description | Hours | Value |
|----------|-------------|-------|-------|
| JJ Range | Receipt and review of motion to withdraw by Mr. Hawthorne; Call with Mr. Ashby regarding preparing response to Motion; Prepare email to Mr. Connelly and Mr. Brenner regarding Motion; Email from Mr. Bierbower; Review and revise memorandum responding to Motion to Withdraw; Call with Mr. Ashby to discuss revisions to Motion and request that he send to client for review before filing. | 2.00 | $1,300.00 |
| MB Bierbower | Memos regarding motion of Jackson' lawyer to withdraw from case; telephone call with Mr. Connelly regarding status, review response to motion to withdraw. | 0.25 | $162.50 |

| C Ashby | Review and analyze Motion to Withdraw; teleconferences with John Hawthorne regarding same; conference with Mr. Range regarding response to same; draft, revise and edit Brief in Response to Withdrawal Motion | 3.50 | $1,330.00 |
|---------|------------|------|-----------|

Mr. Range billed 2.0 hours; Mr. Bierbower, 0.25 hours; and Mr. Ashby, 3.5 hours. The three attorneys billed a total of $2,792.50 to read the motion of counsel to withdraw, analyze it, prepare a memorandum in response, revise the memorandum, consult with their client and discuss the matter among themselves. This is simply excessive. This is not to suggest that the credit union did not have a legitimate interest in counsel withdrawing. But that interest was primarily limited to assuring that withdrawal would not delay the case and that the trial date was maintained. That is not a six-hour, three-attorney undertaking.

Some courses of investigation were closed quickly. Benjamin C. Ackerly, a noted bankruptcy practitioner, billed one-quarter of an hour to this case. This was long before the debtors filed their chapter 13 case. His September 14, 2007 time record was "conference with M. Bierbower regarding involuntary bankruptcy." The time entry immediately followed the granting of the temporary injunction. To Mr. Ackerly's credit, that one conversation appears to have prevented Hunton & Williams from going down a blind alley. Mr. Bierbower also billed for the conference with Mr. Ackerly. The idea of filing an involuntary petition against the debtors cost from $350 to $500. It could do nothing to resolve the issues between the parties but would surely have increased the costs and exposed the credit union to unnecessary risk. *See* 11 U.S.C. §303(i); *In re Stewart,* 2008 WL 4526130 (Bankr.E.D.Va.2008); *In re Jett,* 206 B.R. 407, 409 (Bankr.E.D.Va. 1997); *In re Atlas Mach. & Iron Works, Inc.,* 190 B.R. 796, 803 (Bankr.E.D.Va.1995); *In re Fox,* 171 B.R. 31, 33 (Bankr.E.D.Va.1994).

But, the point is different.  The idea of filing an involuntary petition should never have been considered in the first instance.  Lawyers are highly trained professionals and are expected to exercise professional judgment.  They are not expected to follow-up every random thought that pops into their heads.  And when they do, billing judgment dictates that it not be billed.[14]

The time records reflect that Mr. Range and Mr. Ashby made a mountain out of molehill.  They turned over every stone they could find.  They fully vetted every idea.  They re-created the credit union's six accounts.  This was a basic case that got out of control.

Even the credit union believed that the total fee charged by Hunton & Williams was unreasonable.  Mr. Connelly cut the $282,075.17 fee to be charged to the debtors approximately in half resulting in shifting only $149,000 of the total fee to the debtors.  *See* Response to Debtors' Objection to Proof of Claim, Litigation Invoice (part 1) at 1.  (Docket Entry 194-5).  But Mr. Connelly articulated no principled method or reason to reduce the bill by half.  No analysis of what was reasonable or not reasonable was undertaken.  No analysis of the time records was undertaken.  Mr. Connelly just took a meat cleaver and chopped the bill in half.  This was arbitrary and plainly reflects that even Mr. Connelly knew that the fee was unreasonable.

The court considered the time and effort expended by the nine attorneys and three paralegals, the nature of the services rendered, the complexity of the services, the value of the services to the client, the results obtained,  whether the fees incurred were consistent with those generally charged for similar services, and whether the services were necessary and appropriate.  *Chawla* 255 Va. at

---

[14]Mr. Ashby spoke with a representative of Mrs. Jackson's employer.  It is not immediately clear why Mr. Ashby spoke with Mrs. Jackson's employer.  If the conversation had nothing to do with the case, it is not clear why the credit union was billed for it.  Linda L. Najjoum issued a quick caution and there are no further time records relating to Mrs. Jackson' employer.  *See* Time entries for C. Ashby on November 9, 2007 and November 10, 2007, and L.L. Najjoum on November 12, 2008.  Ex. F at 8.

623, 499 S.E.2d at 833. The amount of time expended on this case was excessive. This case should have been tried by a single attorney, an experienced associate. A reasonable hourly rate for such an individual in Northern Virginia was from about $300 to $350 an hour.

The $24,310.91 for the forensic accountant was wholly unnecessary. Mr. Beatley is quite correct about the manner in which these cases ought to be tried. This court has seen many cases dealing with the accuracy of a statement of account. It is true that reconciling an account can be tedious work. However, where the creditor has the burden of proof, after the creditor provides a credible and admissible statement of account, the debtor has the burden of going forward. A debtor typically needs to show that the records were not maintained in the ordinary course of business, that there was some flaw in the manner in which they were maintained, or that there was a mistake, such as a payment that was made but not credited or, in this case, was  applied to the wrong account. Two types of evidence are generally presented. One is the debtor's oral testimony; the other, documentary evidence. In this type of case, documentary evidence as to payment is ordinarily given greater weight than oral testimony. It is unlikely that a debtor merely saying that he mailed a check is going to be able to show that the creditor who did not record the check made a mistake.

In this case, the debtors had no documentary evidence to support their assertions. Through all the frustrating negotiations that preceded the circuit court suit, the debtors, according to the credit union's general counsel, never produced any documentary evidence showing that the credit union's account was wrong. They produced no documents in response to discovery. They were precluded by order of the circuit court from introducing into evidence any document not produced in discovery. The outcome of the case was reasonably foreseeable.  Counsel merely had to put the pieces together and present it to the circuit court.

16

Mr. Connelly stated that there were complicating factors.  He is correct that a pro se party can add additional time to a case.  Individuals representing themselves have a tendency not to know what proper court procedure is and not to respond fully or timely.  While that may be true, there are remedies for this and they do not add hundreds of hours to a case.  The fact that there were six accounts is a complicating factor but it does not require forensic accounting or hundreds of hours of attorney's time.  The law should have been clear from the beginning that a debtor has, in the first instance, the right to allocate a payment to a particular account.  Thus, if he directs that a payment be applied to the first trust, it must be applied to the first trust.  The credit union may not apply it to one of the other loans.  If a debtor does not designate which account a payment is to be applied to, the creditor has the option of applying the payment as it chooses.  In this case, Mr. Connelly testified that the practice of the credit union was to deposit the checks or the wires into the debtors' savings account and then to draw from the savings account an amount to pay the next payment that became due, for whichever account it may have been.  Tr. at 66-68.  This is an application of a payment by the creditor and controls.  In this case, the payments were all applied by either the debtors or the credit union.  By reviewing the wires for instructions, it is a fairly straightforward issue as to whether the proper account was credited.  If there was no instruction, the credit union's application was correct.  The credit union made an additional effort, to match the payments that came in with payments that were due.  They had the right to do this.  If the credit union did not apply it to the next payment due on any one of the accounts, as long as there was no instruction by the debtors, it could be applied as the credit union saw fit.  This simplifies the accounting significantly.

Mr. Connelly was incorrect in his statements that the burden of proof was on the credit union to prove the status of the accounts.  The burden of proof of showing that the account was current was

on the complainant in the circuit court where the debtors were the moving parties seeking an injunction. They asserted that the account was current. They sought the injunction. The burden of proof was on them. *Harless v. Malcolm,* 197 Va. 56, 57, 87 S.E.2d 817, 817-818 (1955) ("The burden was upon complainants to prove their right to the injunctive relief sought"). To the extent that this incorrect understanding of the law led to additional attorney's fees, it is not something that should be billed to the debtors.

Mr. Connelly stated that the motion to amend the complaint to seek $2.8 million in damages was a significant undertaking. However, the record shows that this motion was not made until after Hunton & Williams was retained. It was filed on October 18, 2007. Hunton & Williams had already billed $40,917.50. The motion was denied on November 17, 2007. More than $175,000 was billed after the motion was denied. While it may have been a complicating factor and certainly required legal attention, it plainly did not account for the bulk of the work done. The October 2007 statement is missing so the court cannot evaluate how much was actually expended on that particular aspect of the case.[15]

Based on the testimony, Hunton & Williams' time records, and Mr. Beatley's expert opinion, the court concludes that the legal fees charged by Hunton & Williams and incurred by the credit union were not reasonable and may not be passed onto the debtors.

The question then is whether the credit union is entitled to recover any of its attorney's fees. It failed to show what fees were reasonably necessary to defend the litigation in the state court. The time entries are blocked making it difficult for the court to determine how much of particular entries

---

[15]The court does not have a copy of the motion to amend and cannot fully evaluate it. But to the extent that Mr. Connelly is correct, that it included a tort or other action not based on the note, the attorney's fees provision in the note may not have been applicable. *Ulloa v. QSP, Inc.,* 271 Va. 72, 624 S.E.2d 43 (2006).

are proper and how much are improper.  It is quite clear that there were too many attorneys assigned to this case and that it was a case that could have been tried by a single experienced associate.

Despite the credit union's failure to prove what a reasonable fee would be, there is evidence in the record that enables the court to make that determination:  the debtors' expert witness, Mr. Beatley.  He testified that a reasonable fee in this case was from $8,000 to $10,000.  The court concurs with his analysis of the work that was necessary to achieve the result and will accept his estimate.  The reasonable attorney's fee will be allowed in the amount of $8,000.00.  The court takes the lower range because it believes that Mr. Beatley included time necessary to defend the motion to amend in his opinion.  While it appears that a part of the motion to amend may have been a request for an accounting, Mr. Connelly testified that it also contained tort claims.  Without knowing more about the motion to amend and whether it falls within the attorney's fees provisions of the note or deed of trust in question, the court is unwilling to accept Mr. Beatley's high end of the range.  The billing statement for October 2007, when most of the work on the motion to amend was done, is missing.

### Costs and Expenses

The credit union is entitled to recover its reasonable costs and expenses.  The debtors do not contest the $7,830.00 for costs and attorney's fees relating to the foreclosure action itself.  The question here is whether the costs incurred with respect to the litigation are appropriate.  The court reviewed all of the expenses in the bills presented and will allow $2,500.00 for expenses.

The amount allowed takes into account necessary and appropriate expenses.  The court will not allow any fees or expenses for the forensic accountant.  This was wholly unnecessary and wholly

19

inappropriate in this case.  The court notes that there are significant photocopy expenses.  While the court included some, it will not allow all of them.  The total amount seems excessive for this case.  Local travel time will not be allowed nor will meals for the attorneys.  There is a charge for an expedited copy of the depositions of the debtors.  The depositions should have been taken months earlier, and had they been, there would have been no need for an expedited copy of them. The court included part of the fees for the deposition transcripts.[16]  The court will not allow any expense for the transcription of the trial record.  It served no purpose.  The credit union prevailed.  No appeal was noted.  The court did include the appearance fee for the court reporter.

## Conclusion

The court will allowed the claimed attorney's fees in the reduced amount of $8,000 plus expenses of $2,500.  This amount is part of the arrearage claim to be paid in the case.

Alexandria, Virginia
July 16, 2010

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

---

[16]The court notes that the credit union was served on September 6, 2007.  Apparently at the hearing on the motion for temporary injunction, a scheduling conference was set for October 16, 2007.  It was continued to October 18, 2007.  A non-jury trial was scheduled on September 26, 2007, for February 28, 2008.  The depositions do not seem to have been taken until February, 2008.

Copy electronically to:

David Prensky
Derek K. Prosser
Gregory H. Counts
Carl Bates, Trustee

16074